

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*United States District Courthouse*
*300 Quarropas Street*
*White Plains, New York 10601*

September 27, 2022

**BY ECF & EMAIL**

The Honorable Kenneth M. Karas
United States District Judge
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

    Re:   *United States v. Stewart Barnwell*, 20 Cr. 445 (KMK)

Dear Judge Karas:

    The Government respectfully submits this letter in advance of the sentencing of defendant Stewart Barnwell. The parties have stipulated to an applicable range under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") of 235 to 293 months' imprisonment. For the reasons explained below, a substantial sentence below the stipulated Guidelines range would be sufficient but not greater than necessary to achieve the purposes of sentencing in this case.

**A.   Factual Background**

    Between at least January 2020 and September 2020, Stewart Barnwell, Miguel Sanchez, Caleb Hooker, and Abimelec Jimenez conspired with each other and with a number of other people to distribute heroin and crack cocaine. Stewart Barnwell led the conspiracy, and defendant Miguel Sanchez was a trusted deputy. The conspirators principally sold narcotics in the vicinity of a certain building on West 174th Street in the Bronx, and Barnwell and Sanchez also supplied wholesale quantities of heroin to a drug trafficking organization led by Christopher Dennis that operated in Newburgh, New York. (The members of that Newburgh conspiracy are charged in a separate indictment in case 20 Cr. 545 (PMH).)

    The operation on 174th Street was a 24-hour, seven-day-a-week affair: multiple street-level dealers worked organized shifts, selling Barnwell's narcotics to end users. The street-level dealers worked two-person, 12-hour shifts, selling crack in blue bags (which the conspirators referred to in intercepted communications as "blues" and "smurfs") and heroin in white bags ("whites," "white girls," etc.). Many of the street-level dealers were drug addicts who were paid in narcotics, which created a strong incentive to continue to work for the organization. (Presentence Investigation Report ("PSR") ¶ 20).

    Barnwell was also the principal heroin supplier to an organization in Newburgh, New York, led by Christopher Dennis. Dennis's organization sold narcotics in the vicinity of First Street and

Honorable Kenneth M. Karas  Page 2
September 27, 2022

Carpenter in Newburgh, which was effectively an open-air drug market. Barnwell and Sanchez supplied hundreds of grams of heroin to Dennis at a time, on a regular basis. For instance, in February 2020, Sanchez and Barnwell traveled to Newburgh to meet with Dennis—a meeting Sanchez communicated with Dennis to arrange—and were surveilled after the meeting appearing to count a large quantity of cash. (*See* PSR ¶ 19.) The following month, Dennis traveled to the Bronx to buy heroin from Barnwell. On the return trip to Newburgh, Dennis was pulled over in a traffic stop and approximately 400 grams of heroin were seized from his car.

All told, during the nine-month period charged in the indictment, Barnwell and his crew distributed at least six kilograms of heroin and at least four kilograms of crack cocaine in the Southern District of New York. (PSR ¶ 31.) The organization used Sanchez's apartment on University Avenue as a stash house. Barnwell and Sanchez regularly supplied the dealers on 174th Street with narcotics prepared at the apartment on University Avenue. That apartment was searched on the day of Barnwell and Sanchez's arrest, and on that day alone, law enforcement recovered hundreds of grams of crack cocaine, in various stages of being cooked, dried, and bagged for resale. The apartment also contained a variety of drug paraphernalia, including scales, razor blades, baggies, and a blow torch, in addition to a substantial amount of cash. (PSR ¶ 15.) On the same date, law enforcement officers searched Barnwell's residence, and recovered more than $100,000 in cash, and jewelry valued at approximately the same amount, including a Rolex with a diamond bezel, a 24-inch gold chain with 649 round, full cut diamonds, and a 28-inch gold chain.

Significantly, Barnwell maintained his drug territory through violence and threats of violence. (PSR ¶ 25). Over the course of several weeks, the Government intercepted calls and text messages demonstrating the day-to-day workings of the conspiracy, as well as Barnwell's use and threatened use of violence. For example, on March 3, 2020, the Government intercepted a call between Barnwell and co-conspirator Jimenez in which Barnwell described how he "almost killed" a low-level dealer in the crew. (PSR ¶ 25(a).) On March 7, 2020, the Government intercepted a call between Barnwell and an unidentified third party in which Barnwell described a traffic dispute during which he had 500 grams in one pocket and his money in the other. (PSR ¶ 25(b).) As Barnwell described it, he "grabbed his *razor*" jumped out of the car, brawled with the construction worker who attempted to stop him in traffic, brandished his "razor" then drove away. (*Id.*) When looking for the construction worker later, he said the guy had no idea he would get "clapped" that day. (*Id.*) On March 12, 2022, the Government intercepted a call between Barnwell and an unidentified third party, in which Barnwell discussed an unpaid drug debt owed to the third party. Barnwell offered to track down the debtor, stating "I'm on this shit, and I got my *grip* with me." On April 18, 2020, Jimenez and an uncharged co-conspirator attacked one of the crew's customers with a machete, beating him violently and slashing him. It is the Government's view that Barnwell directed this attack. (PSR ¶ 25(c).) Months later, in a conversation with his wife, Barnwell described how if he asked, his associates would "pop" someone for him, stating, "they'll come and pick me up. *Strapped* up. Let one of 'em say something to them, it's gonna be a reaction."

In keeping with these intercepted communications, surveillance footage from a pole camera near the crew's stash house also shows Barnwell's use of violence. On August 29, 2020, Barnwell walked down the sidewalk shoving a woman away from the entryway to the stash house. (PSR ¶ 25(d).) Similarly, footage from September 6, 2020, shows Barnwell punching a man in the face, and standing over him when he falls to the sidewalk. (PSR ¶ 25(e).) In a subsequent

intercepted call, Barnwell described how he "knocked that n**** out," suggesting the motivation for the assault was because the victim was cooperating with law enforcement. (*Id.*)

Co-defendants Caleb Hooker and Miguel Sanchez were sentenced to 63 months and 108 months' imprisonment, respectively.

**B. The Plea and Guidelines Calculation**

Count One, the sole count of the Indictment, charged Barnwell and others with conspiring to distribute more than one kilogram of heroin and more than 280 grams of crack cocaine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). On June 1, 2022, Barnwell pleaded guilty pursuant to a plea agreement (the "Plea Agreement") to the lesser-included offense of conspiring to distribute more than 100 grams of heroin and more than 28 grams of crack cocaine, triggering the penalty provision of 21 U.S.C. § 841(b)(1)(B), which provides for a five-year mandatory minimum.

Consistent with the Plea Agreement, the United States Probation Office has calculated an applicable Guidelines range of 235 to 293 months' imprisonment. Probation calculates an applicable offense level of 33: a base offense level of 34, because the offense involved at least 6 kilograms of heroin and at least 4 kilograms of crack cocaine, plus two points for the use, threat, or directed use of violence, and minus three points for timely acceptance of responsibility. (PSR ¶¶ 37-46.) Probation also assesses Barnwell is a career offender, resulting in an offense level of 36, minus three points for timely acceptance of responsibility, for an equivalent resulting offense level of 33. (PSR ¶¶ 43-46.) Barnwell's ten criminal history points place him in criminal history category V; however, because he is a career offender, he is in criminal history category VI. (PSR ¶¶ 49-64.) Significantly, Barnwell has served prior terms of imprisonment for a 2007 third degree attempted robbery (PSR ¶ 57), a 2009 third degree attempted robbery (PSR ¶ 58), and a 2014 assault. (PSR ¶ 61). Probation recommends a below-Guidelines sentence of 188 months' imprisonment. (PSR at 28.)

Defense counsel argues that pursuant to *United States v. Taylor*, 142 S. Ct. 2015 (2022), decided after Barnwell entered his plea in this case, Barnwell's third degree attempted robbery convictions are not "crimes of violence" for purposes of the career offender Guidelines. (Def. Ltr. At 4). *Taylor* held that attempted Hobbs Act robbery is not a crime of violence under the "elements clause" of Section 924(c)(3)(A). Even after *Taylor*, however, attempted robbery under the New York Penal Law still qualifies as a crime of violence for Guidelines purposes. The law is clear that all degrees of *completed* New York robbery qualify as crimes of violence under the elements clause. *See United States v. Periera Gomez*, 903 F.3d 155, 164-66 (2d Cir. 2018). And in *United States v. Moore*, 916 F.3d 231. 239-42 (2d Cir. 2019), the Second Circuit specifically held that completed third-degree robbery in violation of New York law qualifies as a crime of violence under Guidelines Section 4B1.2. These holdings are not disturbed by *Taylor*. Pursuant to Application Note 1 of Section 4B1.2, a "crime of violence" includes the offenses of aiding and abetting, conspiring, and attempting to commit such offenses. Thus, an attempted New York robbery in the third degree qualifies as a predicate crime of violence for purposes of the career offender Guidelines.

Honorable Kenneth M. Karas  Page 4
September 27, 2022

**C. Discussion**

    **1. Applicable Law**

The Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), and district courts are required to treat them as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49.

After calculating the Guidelines, the Court must consider seven factors: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant," (2) the purposes of sentencing discussed in the next paragraph, (3) "the kinds of sentences available," (4) the Guidelines range itself, (5) any relevant policy statements by the Sentencing Commission, (6) "the need to avoid unwarranted sentence disparities among defendants," and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see also Gall*, 552 U.S. at 49-50 & n.6.

In determining the appropriate sentence, Section 3553(a) directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B)    to afford adequate deterrence for criminal conduct;
    (C)    to protect the public from further crimes of the defendant; and
    (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

    **2. A Substantial But Below-Guidelines Sentence Is Appropriate in This Case**

In this case, the nature and circumstances of the offense, Barnwell's history, and the needs to promote respect for the law, provide just punishment, and deter future criminal conduct all weigh in favor of a substantial sentence of imprisonment. But in light of the Department of Justice's policy regarding the crack-to-powder cocaine disparity reflected in the United States Sentencing Guidelines, the Government believes that a modest downward variance would be appropriate.

First, a substantial sentence of imprisonment would reflect the nature and seriousness of the offense and provide just punishment. In the midst of a national opioid epidemic, Barnwell dealt substantial quantities of heroin and crack cocaine in end user and re-distribution quantities. As the Court well knows, the drug trade has real and lasting detrimental effects on our neighborhoods. Dealers profit from the addictions of others, capitalizing on an illness while causing profound negative effects not just for their customers, but for their entire communities. Knowing full well the damage these addictive and deadly substances cause (PSR ¶ 76), Barnwell contributed directly to those detrimental effects, both in the Bronx (where he grew up and lived) and in Newburgh, a community already ravaged by the drug trade. While the extent of the destruction caused by

Barnwell's 24-hour drug bazaar is unknown, his motivation for setting aside his personal experiences and participating in the drug trade is plain – personal gain. His collection of designer cars, gold jewelry, and his stash of cash were frequent subjects of conversation in calls intercepted by the Government. This offense, profiting from poisons which kill hundreds of people a day across the country, is deadly serious and merits a substantial sentence.

Second, the use of violence and threats of violence merits special consideration. References to "straps," "grips," and "razors," "popping" and "clapping," and "almost killing" an associate, when coupled with violence captured by pole cameras, and Barnwell's criminal history, demonstrate the routine, almost incidental nature of the violence required to maintain and control the West 174th Street drug trade. It was no accident that Barnwell's second in command, Miguel Sanchez, was a lifetime parolee with intentional murder and forearms convictions. Barnwell managed his organization through an atmosphere of fear that kept employees in line, competitors at bay, customers coming back, and cash coming in.

Further, the seriousness of the offense is amplified by Barnwell's criminal history. Since 1998, Barnwell has committed an unbroken string of criminal activity, including two prior narcotics felonies (PSR ¶¶ 53, 54), two attempted robberies (PSR ¶¶ 57, 58), attempted assault (PSR ¶ 59), assault (PSR ¶ 61), and menacing that allegedly involved a firearm. (PSR ¶ 60). Barnwell is the definition of a recidivist and protecting the public from his continued crime is an important factor here. The Court's sentence should send the message that narcotics traffickers who profit off poisons which place people's lives at risk, especially after a lifetime of other crime, face serious consequences when they are caught.

Barnwell has lived a life of crime. His instant drug dealing is part of a pattern of endangering his community and disrespecting the law. This Court should recognize that pattern, and sentence him in a manner that recognizes his history and characteristics, the nature of the circumstances of the offenses, and the needs to protect the public and deter crime. However, while the 3553(a) factors support a substantial sentence of incarceration, the Government believes that a modest downward variance is appropriate. On June 22, 2021, the Department of Justice provided public testimony in support of the EQUAL Act, S.79. This proposed legislation would eliminate the powder-to-cocaine base sentencing disparity in 21 U.S.C. §§ 841 and 960. Although the Department supports elimination of the powder-to-cocaine base disparity, until legislation to that effect is passed, the current statutory and Guidelines provisions remain in effect. In this case, the stipulated 4 kilograms of cocaine base push the base offense level from 32 to 34. If the 4 kilograms of cocaine base were treated as powder cocaine, then, including the stipulated 6 kilograms of heroin, the total converted drug weight would be 6,800KG. The resulting offense level, keyed off the drug weight and not accounting for the career offender guidelines, would be 29 after acceptance of responsibility. The Court can and should, consistent with the law and current sentencing framework, consider the powder-to-cocaine base disparity in assessing the Section 3553(a) factors. *See Kimbrough v. United States*, 552 U.S. 85, 106-08 (2007); *United States v. Cavera*, 550 F.3d 180, 191-92 (2d Cir. 2008) (en banc).

Honorable Kenneth M. Karas  Page 6
September 27, 2022

**Conclusion**

For the reasons set forth above, the Court should impose a significant sentence of imprisonment that is modestly below the stipulated Guidelines range.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:     /s/
Lindsey Keenan / Derek Wikstrom
Assistant United States Attorneys
Tel: (212) 637-1565 / (914) 993-1946

Cc: Stephen Lewis, Esq.